**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

MOUNTAIN LINK ASSOCIATES, INC. et al.,

        Plaintiffs,

v.                              CIVIL ACTION NO.   2:13-cv-16860

CHESAPEAKE ENERGY CORPORATION, et al.,

        Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending are the motion to amend the Complaint filed by plaintiffs Mountain Link Associates, Inc. ("Mountain Link"), and Rockford Energy, LLC ("Rockford"), the motion to dismiss filed by defendant Chesapeake Appalachia, LLC ("CHK Appalachia"), and the motion to dismiss filed by defendants Chesapeake Energy Corporation ("CHK") and Chesapeake Energy Marketing, Inc. ("CHK Marketing"). For the reasons that follow, Plaintiffs' motion to amend the Complaint [ECF 25] is **GRANTED,** CHK Appalachia's motion to dismiss [ECF 7] is **GRANTED**, and CHK and CHK Marketing's motion to dismiss [ECF 8] is **GRANTED**. This Order also directs Plaintiffs to file an Amended Complaint no later than October 23, 2014.

*I. BACKGROUND*[1]

This dispute arises from the assignment of oil and gas drilling interests in two leasehold estates in West Virginia and centers around the interpretation of the assigning instruments.

Plaintiffs have royalty interests in the leaseholds. Plaintiff Mountain Link is a West Virginia corporation. Plaintiff Rockford is a West Virginia limited liability corporation. Both have their principal place of business in West Virginia. Jackson A. Smith is the President and CEO of Mountain Link and the Managing Member of Rockford.

Defendants have economic interests in the oil and gas drilling operations in which Plaintiffs have royalty interests. Defendant CHK Appalachia is an Oklahoma limited liability company created in Oklahoma, with its principal place of business in Oklahoma, and wholly-owned by Defendant CHK, an Oklahoma corporation with its principal place of business in Oklahoma. Defendant CHK Marketing and Defendant CHK Operating, Inc. ("CHK Operating") are Oklahoma corporations wholly-owned by CHK.

*A. The Mason Lease*

Plaintiff Mountain Link owns a leasehold estate in the oil and gas rights appurtenant to a 198-acre tract in Marshall County, West Virginia (the "Mason Lease"). On July 19, 2007, Mountain Link assigned its rights in the Mason Lease to Reed Brothers Limited Partnership, LLC ("Reed Brothers"), reserving to Mountain Link a 3.125% overriding royalty in the gross proceeds of the sale of oil and natural gas. The reservation expressly provided that "said overriding royalty shall be free and clear of all costs of development and operations."

---

[1] The Court grants Plaintiffs' Motion to Amend in Part II, *infra*. The following facts are drawn from Plaintiffs' Amended Complaint and the attached exhibits. Defendant CHK Operating, Inc., has also been added pursuant to Plaintiff's Amended Complaint.

In 2009, Reed Brothers sold its interest in the Mason Lease to Defendant CHK Appalachia, and thereafter CHK Appalachia began drilling on the Mason Lease tract. CHK Appalachia made its first royalty payment to Mountain Link in December 2009. Beginning with that payment and continuing thereafter, CHK Appalachia allegedly made improper deductions from Mountain Link's override royalty payments. On September 13, 2010, Jackson A. Smith sent a letter to CHK Operating on behalf of Mountain Link protesting certain deductions. Thereafter, Chesapeake Appalachia ceased making the deductions. Then, on December 21, 2010 or 2011, CHK Appalachia refunded the prior deductions from Mountain Link's royalty payments during the prior period.[2]

In March 2011, CHK Appalachia again began making deductions from the royalty payments which Plaintiffs characterize as improper. On June 14, 2011, Mountain Link assigned its interests in its West Virginia leaseholds to Plaintiff Rockford. On November 9, 2011 Jackson A. Smith sent a letter protesting the deductions, this time to CHK Appalachia and in his capacity as Managing Member of Rockford. The letter alleged improper deductions from March 2011 to October 2011 totaling $3,182.39. From December 2011 to May 2012, Plaintiffs allegedly did not receive any royalty payments.

On May 21, 2012, Attorney Jason P. Blose wrote a letter to Smith on CHK letterhead on behalf of CHK Appalachia, replying to Smith's letter of November 9, 2011. CHK's letter informed Smith of CHK Appalachia's position that the overriding royalty payment was being calculated correctly. This letter asserted that production from the Mason Lease was sold by CHK Appalachia to CHK Marketing, which

---

[2] The Amended Complaint cites December 21, 2011 and describes refunds covering a two-year period. However, the discussion of the subsequent events in the Amended Complaint suggests that there may be a typographical error and that 2010 was in fact intended.

gathers and transports the products from the wellhead point of sale to a value-added downstream point of sale. As part of the marketing process, [CKH Marketing] aggregates the products from multiple wells into a pool, and the volume of products aggregated in this pool is then sold downstream to many different buyers, at different prices. On a monthly basis, [CHK Marketing] determines a weighted average sales price for the products sold downstream from the pool, and [CHK Marketing] pays [CHK Appalachia] 97% of this weighted average sales price (the outstanding 3% is a marketing fee) for production at the wellhead, less the costs it incurs between the wellhead point of sale and the value-added downstream point of sale. . . . [CHK Appalachia] is paying the [overriding royalty interest] based [sic] the proceeds received from the sale to [CHK Marketing]. While your statement shows the fees incurred by [CHK Marketing] as deductions in an effort to be transparent, please understand that these costs are not in fact deductions taken by [CHK Appalachia], but rather factors considered in determining the market value of the products for the wellhead sale from [CHK Appalachia] to [CHK Marketing]. Further, while the [overriding royalty interest] states that it is "free and clear of all costs of development and operations", we do not believe that language would preclude the deduction of post-production costs.

(ECF 25–1 at 22.)

Plaintiffs began receiving royalty checks again in June 2012. Plaintiffs assert that the June 2012 check wrongfully withheld 88.7% of the royalties due, while subsequent checks were improperly reduced by up to 40% for various post-production operations charges, most of which are paid to wholly-owned subsidiaries of CHK Appalachia.[3]

## B. The Antero George Lease

Plaintiff Mountain Link also owned a leasehold estate in the oil and gas rights appurtenant to a 36.1-acre tract in Harrison County, West Virginia (the "Antero George Lease"). On April 11, 2006, Mountain Link conveyed its rights in the Antero George Lease to R&K Oil and Gas, Inc. ("R&K"), reserving to Mountain Link a 3.125% overriding royalty in the gross

---

[3] From the context it appears that Plaintiffs probably intended to allege that the deductions were paid to wholly-owned subsidiaries of CHK.

proceeds of the sale of oil and natural gas. The reservation expressly provided that "said overriding royalty shall be free and clear of all costs of development and operations."

On August 10, 2006, Mountain Link conveyed half of its override royalty interest to David Bowyer, retaining a 1.5622% royalty interest.[4] On June 14, 2011, Mountain Link assigned its interests in its West Virginia leaseholds to Rockford. At some point in 2012, Antero Resources Appalachia began drilling on the Antero George Lease tract, and the Antero George Lease tract was combined by the lessor with other tracts to form a drilling unit of 298.39 acres (the "Antero George Unit"). Plaintiffs assert that this entitled them to royalties without deductions from oil and gas production from wells on any tract within the Antero George Unit. In September of 2012, CHK Appalachia acquired the rights and obligations of the Antero George Lease from R&K. On June 6, 2013, CHK Operating sent Rockford a document entitled "Divison Order." Plaintiffs assert that that document falsely represented that the Antero George Unit was 296.39 acres and that Plaintiffs' interest in the Antero George Unit was 0.00101772 rather than 0.00190311, which they further assert was an understatement of 86.997315%. Plaintiffs allege that CHK Operating sought to use the "Division Order" to alter illegally the terms of its obligations to the Plaintiffs by requiring Plaintiffs to hold CHK Operating harmless from all liability resulting from its intentional miscalculation of royalties due Plaintiffs and also gave CHK Operating the right to withhold payments to Plaintiffs for royalties due if Plaintiffs challenged any miscalculation of royalties. Plaintiffs allege that CHK Operating refused and failed to pay royalties from oil and gas production on the Antero George Unit unless and until Plaintiffs agreed to the terms of the "Division Order."

---

[4]  The Amended Complaint asserts that Mountain Link retained a 1/64[th] interest. This should come out to 1.5625%. However, all other references in the Amended Complaint are to a 1.5622% interest.

On July 24, 2014, more than ten months after oil and gas production had begun on the Antero George Unit, CHK Appalachia made its first royalty payment to Plaintiffs, in the amount of $3,961.01, for production from September 2012 to March 2013. Plaintiffs assert that the royalty payment of July 24, 2013 and subsequent royalty payments by CHK Appalachia "and/or" CHK Operating improperly understated Plaintiffs' ownership interest in the Antero George Unit and improperly deducted marketing costs, gathering fees, hauling fees, transporting fees, processing costs, taxes, line loss fees and third party costs and fees paid to "Chesapeake's" wholly-owned subsidiaries.[5] Plaintiffs characterize all of these fees as operations charges and assert that their deduction was in violation of "Chesapeake's" contractual obligations to Plaintiffs. Plaintiffs estimate that the understatement of the royalties owed was approximately 87%, while an additional 30% was deducted as "operating costs".

*C. Procedural History*

Plaintiffs filed a Complaint in this Court on July 2, 2013. The Complaint alleges (1) breach of contract, (2) fraud, (3) conversion, and (4) unconscionability and unfair dealing. Defendant CHK filed an "Answer and Motion to Dismiss" on September 23, 2013, which seeks dismissal of the fraud count. Defendants CHK and CHK Marketing filed a motion to dismiss on September 23, 2013, seeking dismissal of the Complaint.[6] Plaintiffs filed a Motion to Amend on

---

[5] Here, Plaintiffs probably meant to allege that the deductions were paid to CHK's wholly-owned subsidiaries.

[6] Plaintiffs' Amended Complaint also contains a section requesting punitive damages. To the extent that Plaintiffs plead punitive damages as a cause of action, this Court in *Leo v. Beam Team Inc.*, 2012 WL 1111374 (S.D. W.Va. Apr. 2, 2012) clarified that punitive damages are not a cause of action but rather a potential remedy. *Id.* at *5 & n.2. *See also Brown v. Tethys Bioscience*, No. 1:10–1245, 2011 WL 1627353, at *5 (S.D. W.Va. Apr. 28, 2011) ("To the extent plaintiffs have pleaded punitive damages as a cause of action, that is improper."). To the extent that Defendants CHK and CHK Marketing request dismissal of Plaintiff's request for punitive damages, "punitive damages is not a cause of action subject to dismissal under Rule 12(b)(6)." *Charles v. Front Royal Volunteer Fire & Rescue Dep't, Inc.*, No. 5:13cv00120, 2014 WL 1906835, at *7 (W.D. Va. May 13, 2014) (internal quotation marks omitted). However, since the motion to dismiss filed by Defendants CHK and CHK Marketing does not single out

February 14, 2014, to which they attached a proposed Amended Complaint. Defendants did not oppose the motion.

## II. MOTION TO AMEND

Plaintiffs seek leave to amend their Complaint to set forth additional allegations (those pertaining to the Antero George Lease) and to add a new defendant (CHK Operating).

Federal Rule of Civil Procedure 15(a)(1) states, in pertinent part, that "[a] party may amend its pleading once as a matter of course (A) within 21 days after serving it, or (B) . . . 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier." If a party seeks to amend its pleadings in all other cases, it may only do so "with the opposing party's written consent or the court's leave.   The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). Rule 15(a) grants the district court broad discretion concerning motions to amend pleadings, and leave should be granted absent some reason "such as undue delay, bad faith, or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party . . . [or] futility of amendment." *Foman v. Davis*, 371 U.S. 178, 182 (1962); *see also Ward Elec. Serv. v. First Commercial Bank*, 819 F.2d 496, 497 (4th Cir. 1987); *Gladhill v. Gen. Motors Corp.*, 743 F.2d 1049, 1052 (4th Cir. 1984).

Here, Plaintiffs' Motion to Amend was filed on February 14, 2014, which is not within 21 days of the Defendants' filing of their motions to dismiss on September 23, 2013, or within 21 days of Plaintiffs' filing of the original Complaint on July 2, 2013.

Plaintiffs allege in their Motion to Amend that, after filing the original Complaint,

---

Plaintiffs' request for punitive damages but rather seeks dismissal of the Complaint, this Court need not address the issue of punitive damages on this Rule 12(b)(6) motion.

Plaintiffs' counsel obtained new information from Defendants documenting that Defendants were also wrongly withholding oil and gas royalty payments owed to Plaintiffs from Defendants' oil and gas drilling operations on an additional leasehold estate in Harrison County, West Virginia. They further allege, and it also so appears from the Amended Complaint, that the alleged wrongfulness of Defendants' actions turns on the same operative contractual language as that contained in the Mason Lease assignment at the center of Plaintiffs' original Complaint. Plaintiffs do not seek to add any new causes of action, but rather to plead additional allegations in support of the causes of action originally pled. Plaintiffs also seek to add an additional Defendant, Chesapeake Operating, which Plaintiffs allege was also involved in the wrongful actions alleged in the original Complaint.

Permitting amendment is proper here because the Amended Complaint is allegedly based on information not available to Plaintiffs at the time they filed their original complaint. Moreover, the Amended Complaint does not raise new claims. Finally, Defendants have not objected.

For these reasons, and pursuant to Fed. R. Civ. P. 15(a)(2), the Court **GRANTS** Plaintiffs' motion for leave to file an Amended Complaint [ECF 25]. Because the Amended Complaint does not present any novel claims or legal theories, the Court will proceed to consider Defendants' motions to dismiss as they relate to the Amended Complaint.

### III. DEFENDANTS' MOTIONS TO DISMISS

#### A. Rule 12(b)(6) Standard

Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Allegations "must be simple, concise, and direct" and "[n]o technical form is required." Fed. R. Civ. P. 8(d)(1). A motion to dismiss under Fed. R. Civ. P. 12(b)(6) tests the legal sufficiency of a civil complaint. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). "[I]t does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A C. Wright & A. Miller, *Federal Practice and Procedure* § 1356 (1990)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A court decides whether this standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer that "the defendant is liable for the misconduct alleged." *Id.* A motion to dismiss will be granted if, "after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." *Edwards*, 178 F.3d at 244.

#### B. CHK Appalachia's Motion to Dismiss

CHK Appalachia has filed an "Answer and Motion to Dismiss." The only part of that document that reads as a motion to dismiss is the following conclusory sentence: "The allegations do not set forth with particularity facts that would satisfy the requirements of Rule 9(b) of the Federal Rules of Civil Procedure, and CHK Appalachia therefore moves to dismiss the fraud count of the Complaint." (ECF 7 at 6.) CHK Appalachia's motion is not accompanied by a memorandum of law. Local Rule 7.1(a)(2) states that a memorandum must accompany a motion to dismiss, failing which the Court shall deny the motion without prejudice. LR Civ. P. 7.1(a)(2). However, because Defendants CHK and CHK Marketing have also moved to dismiss the fraud count and have provided a memorandum in support of their motion which more fully addresses the Rule 9(b) argument, the Court will address the merits of CHK Appalachia's motion to dismiss at the same time that it addresses the motion to dismiss filed by CHK and CHK Marketing.

### C. CHK and CHK Marketing's Motion to Dismiss

#### a. Breach of Contract

Plaintiffs' Amended Complaint alleges that the Defendants have failed to pay royalties due to the Plaintiffs from the proceeds received by the Defendants from the extraction and sale of oil and gas from the Mason and Antero George leaseholds.

"[U]nder West Virginia law, to state a claim for breach of contract under Rule 8, a plaintiff must allege the following elements: the existence of a valid, enforceable contract, that the plaintiff has performed under the contract, that the defendant has breached or violated its duties or obligations under the contract, and that the plaintiff has been injured as a result." *Wince*

*v. Easterbrooke Cellular Corp.*, 681 F. Supp. 2d 688 693 (N.D. W. Va. 2010) (internal quotation marks omitted).

Plaintiffs have pointed to contractual obligations that were assigned by Reed Brothers and R&K, respectively, to Defendant CHK Appalachia. However, Defendants CHK and CHK Marketing argue that the breach of contract claim must be dismissed as to CHK and CHK Marketing because Plaintiffs have not alleged the existence of any contractual relationship between Plaintiffs and CHK and CHK Marketing. CHK and CHK Marketing point out that Plaintiffs have not alleged that CHK or CHK Marketing are liable under any theory corporate veil-piercing or that the Court should ignore CHK Appalachia's corporate form. However, "a district court must not dismiss a potentially valid claim just because the plaintiff fails to plead the proper legal theory." *American Microtel, Inc. v. SFA, Inc.*, No. 94-1538, 1995 U.S. App. LEXIS 15524 (4th Cir. June 7, 1995) (unpublished). *Accord Wudtke v. Davel*, 128 F.3d 1057, 1061 (7th Cir. 1997) ("It is not necessary to specify particular legal theories in a complaint, so long as the facts alleged give adequate notice to the defendant of the basis of the suit."); *Flickinger v. Harold C. Brown & Co., Inc.*, 947 F.2d 595, 599–600 (2d Cir. 1991) ("[F]ederal pleading is by statement of claim, not legal theory."); *Evans v. McDonald's Corp.*, 936 F.2d 1087, 1090–91 (10th Cir. 1991); *Fitzgerald v. Codex Corp.*, 882 F.2d 586, 589 (1st Cir. 1989). Thus, it is necessary to determine whether the facts alleged, taken as true, establish a sufficient basis for piercing the corporate veil for the purpose of allowing the breach of contract claim against CHK and CHK Marketing to go forward on the basis of the contractual relationship between Plaintiffs and CHK Appalachia.

In their response to the motion to dismiss, Plaintiffs argue that they have "identified and demonstrated to this Court . . . that the CHK defendants have . . . acted in concert and that they share the profits arising from the duties owed to the plaintiffs . . . ." (ECF 17 at 4.) Further, they argue that the May 21, 2012 letter on CHK letterhead by Attorney Jason P. Blose demonstrates "the three-in-one reality at the base of plaintiffs' claim." (*Id.* at 6.)

The Court has not found any cases on the applicable rule in West Virginia as to which state's law applies when a party seeks to pierce the corporate veil of a foreign entity. In other jurisdictions, some courts have applied the internal affairs doctrine to impose the law of the state of incorporation upon piercing claims, while others have conducted a general choice-of-law analysis. *See Choice of Law in Veil-Piercing Litigation: Why Courts Should Discard the Internal Affairs Rule and Embrace General Choice-of-Law Principles*, 64 N.Y.U. ANN. SURV. AM. L. 85, 90 & n.13–14 (2008). As this Court sits in West Virginia, West Virginia's choice-of-law rules provide the appropriate framework for the latter inquiry. *See Klaxon Co. v. Stentor Elec. Mfg. Co., Inc.*, 313 U.S. 487 (1941). West Virginia courts rely on the RESTATEMENT (SECOND) OF CONFLICT OF LAWS (1971) ("Second Restatement"), both the general provisions of § 6 and any applicable more specific provisions, to resolve more complex choice-of-law issues. *See M & S Partners v. Scottsdale Ins. Co.*, 277 Fed. Appx. 286, 289 (4th Cir. 2008); *Brewer v. Nat'l Indem. Co.*, 363 F.3d 333, 338 (4th Cir. 2004). General choice-of-law principles are set out in § 6(2) of the Second Restatement, which identifies several factors for a court to consider in determining which forum's law it is appropriate to apply in the absence of a statutory directive.[7] A more

---

7 Those factors are the following:

    (a) the needs of the interstate and international systems;
    (b) the relevant policies of the forum;

specific provision that may be applicable is § 307 of the Second Restatement, which provides that "[t]he local law of the state of incorporation will be applied to determine the existence and extent of a shareholder's liability to the corporation for assessments or contributions and to its creditors for corporate debts." Come courts have relied on § 307 to apply the law of the state of incorporation to veil-piercing analysis. *See, e.g., TAC-Critical Sys., Inc. v. Integrated Facility Sys., Inc.*, 808 F.Supp.2d 60, 64 (D.D.C. 2001) ("Another approach looks to the RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 307 (1971), which has been interpreted to abrogate general choice-of-law principles in veil-piercing cases.").

Here, Oklahoma law, as the law under which CHK Appalachia was created, would apply under the internal affairs doctrine and § 307.[8] Assuming, arguendo, that the Court should apply the factors listed in § 6 of the Second Restatement to the facts of this case, they would indicate either the laws of West Virginia or of Oklahoma. But the Court need not undertake an extensive general choice-of-law analysis, because the result is not outcome determinative. Both the Oklahoma and West Virginia law of veil-piercing point to the same result.

The Court has not been directed to or found any Oklahoma cases addressing veil-piercing or alter ego theories with respect to limited liability corporations specifically. However, Oklahoma permits a court to hold one corporation liable for the actions of another under the

---

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue;
(d) the protection of justified expectations;
(e) the basic policies underlying the particular field of law;
(f) certainty, predictability, and uniformity of result; and
(g) ease in the determination and application of the law to be applied.

8  In addition, under W. Va. Code § 31B-10-1001, "[t]he laws of the state or other jurisdiction under which a foreign limited liability company is organized govern its organization and internal affairs and the liability of its managers, members and their transferees."

theory of alter-ego liability "if (1) the separate existence is a design or scheme to perpetuate a fraud, or (2) one corporation is merely an instrumentality or agent of the other." *Gilbert v. Sec. Fin. Corp. of Okla.*, 152 P.3d 165, 175 (Okla. 2006). The factors to be considered in making this determination "hinge primarily on control" and include:

> (1) whether the dominant corporation owns or subscribes to all the subservient corporation's stock, (2) whether the dominant and subservient corporations have common directors and officers, (3) whether the dominant corporation provides financing to the subservient corporation, (4) whether the subservient corporation is grossly undercapitalized, (5) whether the dominant corporation pays the salaries, expenses or losses of the subservient corporation, (6) whether most of the subservient corporation's business is with the dominant corporation or the subservient corporation's assets were conveyed from the dominant corporation, (7) whether the dominant corporation refers to the subservient corporation as a division or department, (8) whether the subservient corporation's officers or directors follow the dominant corporation's directions, and (9) whether the corporations observe the legal formalities for keeping the entities separate.

*Id.* "Also important is the commonality of purpose between the corporations." *Oliver v. Farmers Ins. Grp. of Cos.*, 941 P.2d 985, 987 (Okla. 1987).

The West Virginia Supreme Court of Appeals has held that W.Va. Code § 31B–3–303 permits the equitable remedy of piercing the veil to be asserted against a West Virginia limited liability company. *See Kubican v. The Tavern, LLC*, 752 S.E.2d 299, 306 (W. Va. 2013). To pierce the corporate veil and hold shareholders personally liable in a breach of contract case

> there is normally a two-prong test: (1) there must be such unity of interest and ownership that the separate personalities of the corporation and of the individual shareholder(s) no longer exist (a disregard of formalities requirement) and (2) an inequitable result would occur if the acts are treated as those of the corporation alone (a fairness requirement).

*Laya v. Erin Homes, Inc.*, 352 S.E.2d 93, 100 (W. Va. 1986). *See also Kubican*, 752 S.E.2d at 311–12. In *Laya*, the West Virginia Supreme Court of Appeals of set out a non-exhaustive list of factors that might be relevant in determining whether to pierce a corporate veil:

14

(1) commingling of funds and other assets of the corporation with those of the individual shareholders;

(2) diversion of the corporation's funds or assets to noncorporate uses (to the personal uses of the corporation's shareholders);

(3) failure to maintain the corporate formalities necessary for the issuance of or subscription to the corporation's stock, such as formal approval of the stock issue by the board of directors;

(4) an individual shareholder representing to persons outside the corporation that he or she is personally liable for the debts or other obligations of the corporation;

(5) failure to maintain corporate minutes or adequate corporate records;

(6) identical equitable ownership in two entities;

(7) identity of the directors and officers of two entities who are responsible for supervision and management (a partnership or sole proprietorship and a corporation owned and managed by the same parties);

(8) failure to adequately capitalize a corporation for the reasonable risks of the corporate undertaking;

(9) absence of separately held corporate assets;

(10) use of a corporation as a mere shell or conduit to operate a single venture or some particular aspect of the business of an individual or another corporation;

(11) sole ownership of all the stock by one individual or members of a single family;

(12) use of the same office or business location by the corporation and its individual shareholder(s);

(13) employment of the same employees or attorney by the corporation and its shareholder(s);

(14) concealment or misrepresentation of the identity of the ownership, management or financial interests in the corporation, and concealment of personal business activities of the shareholders (sole shareholders do not reveal the association with a corporation, which makes loans to them without adequate security);

(15) disregard of legal formalities and failure to maintain proper arm's length relationships among related entities;

(16) use of a corporate entity as a conduit to procure labor, services or merchandise for another person or entity;

(17) diversion of corporate assets from the corporation by or to a stockholder or other person or entity to the detriment of creditors, or the manipulation of assets and liabilities between entities to concentrate the assets in one and the liabilities in another;

(18) contracting by the corporation with another person with the intent to avoid the risk of nonperformance by use of the corporate entity; or the use of a corporation as a subterfuge for illegal transactions;

(19) the formation and use of the corporation to assume the existing liabilities of another person or entity.

*Laya*, 352 S.E.2d at 98–99.

Plaintiffs have alleged that CHK wholly owns both CHK Appalachia and CHK Marketing, satisfying Oklahoma's factor (1). Plaintiffs have alleged that CHK, CHK Marketing, and CHK Appalachia all have the same principal place of business at 6100 North Western Avenue, Oklahoma City, Oklahoma, satisfying West Virginia's factor (12). Plaintiffs have also pointed to the May 21, 2012 letter on CHK letterhead by Attorney Jason P. Blose, who represented that he was speaking on behalf of CHK Appalachia with regard to the Mason Lease. From this letter it is reasonable to infer that CHK at a minimum shares legal expenses and employees with CHK Appalachia, in satisfaction of Oklahoma's factor (5) and West Virginia's factor (13). The letter also indicates that CHK Marketing buys oil and gas from CHK Appalachia's wells and sells it to downstream customers, charging CHK Appalachia a 3% marketing fee for its service. In addition, the "Division Order" with regard to the George Antero Lease shows that CHK Operating, which is also a wholly-owned subsidiary of CHK, has held itself out to Plaintiffs as the payor of the Antero George Lease assigned to CHK Appalachia.

These facts support an inference that the CHK entities work together as a vertically integrated enterprise for the common purpose of commercializing oil and natural gas. However, Plaintiffs' allegations do not raise reasonable inferences about the remaining factors, including the several that have to do with the formal separation of Defendants' assets or with Defendants' internal governance structure. Plaintiffs allege no fraud perpetuated by this corporate structure, such as might occur if CHK Appalachia had intentionally been kept undercapitalized so as to be unable to meet its liabilities, thus failing West Virginia's fairness requirement. At the same time, the inference of a certain degree of vertical integration does not bear the weight of the conclusion

that CHK and its subsidiaries are merely instrumentalities or agents of one another, as would be required under Oklahoma law. Plaintiffs' pleadings are ultimately too thin a reed on which to rest a theory of alter ego liability.

As the only contractual relationship that allegedly exists is that between Plaintiffs and CHK Appalachia, the motion to dismiss filed by CHK and CHK Marketing is **GRANTED** as to the breach of contract claim.

*b. Fraud*

Plaintiffs argue that Defendants' representations about their obligations and duties to Plaintiffs were fraudulent. In order to establish a claim for fraud in West Virginia, Plaintiffs must prove:

> (1) that the act claimed to be fraudulent was the act of the defendant or induced by him; (2) that it was material and false; that plaintiff relied upon it and was justified under the circumstances in relying upon it; and (3) that he was damaged because he relied upon it.

*Highmark W. Va., Inc. v. Jamie*, 655 S.E.2d 509, 515 (W. Va. 2007) (citations omitted). Fraud claims in federal court must meet the special pleading rules of Rule 9(b) of the Federal Rules of Civil Procedure. Rule 9(b) requires that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." To meet this standard, a plaintiff "must, at a minimum, describe the time, place and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *United States ex rel. Wilson v. Kellog Brown & Root, Inc.*, 525 F.3d 370, 379 (4th Cir. 2008) (internal quotations marks omitted). Rule 9(b) serves four purposes: (1) to ensure the defendant has enough information to formulate a defense; (2) to protect defendants from frivolous suits; (3) to eliminate fraud actions in which all the facts are learned after discovery; and (4) to protect

defendants from harm to their goodwill and reputation. *See Harrison v. Westinghouse, Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999).

CHK and CHK Marketing argue that the fraud claim must be dismissed (1) because CHK and CHK had no contractual duty to pay royalties to Plantiff, and (2) because Plaintiffs fail to set forth specific facts, dates, or conduct by CHK or CHK Marketing sufficient to plead fraud with specificity under F. R. Civ. P. 9(b).

CHK and CHK Marketing's first argument is without merit. The commission of fraud does not require the existence of a contractual relationship. The existence of a contractual relationship is neither an element of fraud nor a logical predicate of any of the elements of fraud.

CHK and CHK Marketing's second argument is meritorious, however. Plaintiffs have pointed to the May 21, 2012 letter sent by Attorney Jason P. Blose to Rockford asserting that the overriding royalty payments to Plaintiffs were being calculated correctly under the terms of the Mason Lease assignment and that CHK Appalachia was therefore justified in continuing to deduct the types of expenses that it had in the past. Plaintiffs assert that the letter's interpretation of CHK Appalachia's contractual obligations and duties to Plaintiffs was false. The letter asserted a role by CHK Marketing in the calculation of the Mason Lease royalty payments.[9] It was also written on CHK letterhead, so that the allegedly false statements therein might be seen as enjoying CHK's imprimatur. Viewing the pleadings in the light most favorable to Plaintiffs, they allege a material misrepresentations by CHK and CHK Marketing of CHK Appalachia's contractual obligations to Plaintiffs.

---

[9] Namely, CHK Marketing aggregated oil and gas from multiple wellheads, selling the oil and gas to multiple buyers at different prices and calculating a weighted average sales price, and then charging a 3% marketing fee before passing on the remaining 97% of the weighted average sales price to Chesapeake Appalachia, to be used as the baseline for the override royalty payments.

18

Nevertheless, beyond conclusory assertions by the Plaintiffs, the pleadings allege insufficient facts to establish justifiable reliance or damage as a result of the reliance, two of the elements of fraud. Beyond their conclusory assertion that they "relied upon Defendants' material misrepresentations to their detriment" (ECF 25-1 at 10), Plaintiffs do not point to any acts of theirs in reliance on Defendants' representations about the correctness of their calculations of the royalty deductions. Even if they had, however, it does not appear that any reliance would have been justifiable. The May 21, 2012 letter by Attorney Jason P. Blose specified in clear terms that it was informing Rockford of "Chesapeake's position" that the royalty was being calculated correctly. (ECF 25-1 at 21.) The letter further specifies that "we do not believe" the language of the assignment would preclude the deduction of post-production costs. (*Id.* at 22.) Thus, the letter was explicit in qualifying the letter's statements regarding CHK Appalachia's contractual obligations to Plaintiffs, putting Plaintiffs on notice that they were merely interpretations. Finally, just as Plaintiffs do not allege any acts they undertook in reliance on the alleged misrepresentations, they also do not allege any damage that occurred to them as a result of any reliance on their part.

Therefore, the motion to dismiss filed by CHK and CHK Marketing is **GRANTED** as to the fraud claim.

*c. Conversion*

CHK and CHK Marketing argue that Plaintiffs have failed to plead sufficient facts to satisfy the elements for conversion under West Virginia law. This is so, they assert, because the party with the obligation to compute and pay royalties to the Plaintiffs is CHK Appalachia and

no facts are pled indicating that any money intended for the Plaintiffs or in the control or ownership of the Plaintiffs was taken by CHK or CHK Marketing.

"In West Virginia, conversion is any distinct act of dominion wrongfully exerted over the property of another, and in denial of his rights." *Tilhance Creek Invs., LLC v. BCBank, Inc.*, No. 12–0290, 2013 WL 1286130, at *8 (W. Va. Mar. 29, 2013).

In the section of their Amended Complaint setting forth allegations specific to their conversion count Plaintiffs allege that "royalties which are the sole property of the Plaintiffs are derived from the sale of gas by the Defendant, Chesapeake Appalachia, each month and are thereafter held by and under the sole control of the Defendants until paid to Plaintiffs in accordance with the terms of the Assignment." (ECF 25-1 at 10.) They further allege that "Defendants, without justification or explanation, withheld all royalties belonging to the Plaintiffs from December 2011 through May 2012 on the Mason lease. Beyond and thereafter, Defendants improperly converted to their own use, and failed to pay, substantial portions of the royalties which rightfully belonged to the Plaintiffs." (*Id.* at 11.) As discussed earlier, CHK Appalachia is the only Defendant alleged to have a contractual relationship with Plaintiffs. Although Plaintiffs here allege control of the royalty money by all the Defendants in this action, these conclusory allegations as to control over the royalties by CHK and CHK Marketing are not supported by any of the more detailed factual allegations in the Amended Complaint. Moreover, the Court has already declined to ignore CHK Appalachia's corporate structure, finding in the allegations insufficient indicia that the other Defendants have control over CHK Appalachia's operations.

Therefore, the motion to dismiss filed by CHK and CHK Marketing is **GRANTED** as to the conversion claim.

d. *Unconscionability and Breach of Fair Dealing*

Plaintiff's original Complaint alleges unconscionability and breach of fair dealing by CHK Appalachia only. (ECF 1 at 8–9.) Plaintiffs' response to the motion to dismiss the original Complaint filed by CHK and CHK Marketing asserts that "the Complaint herein alleges Unconscionability and Breach of Duty of Fair Dealing as against CHK Appalachia only. To the extent that the other Chesapeake defendants argue the applicability or inapplicability of these claims to them, their arguments are moot – unless, of course, the three Chesapeake defendants are found to be inseparable for purposes of contract, breach, liability, or damages." (ECF 17 at 3 n.2.) The section of the Amended Complaint pleading this cause of action makes the same material allegations about CHK Appalachia (ECF 25–1 at 11–12) but also inserts a new line concluding that unspecified "Defendants' actions are unconscionable and in violation of West Virginia Code §§ 46–2A–108 and 46–2-302" (*Id.* at 12). The Amended Complaint also asserts, in the section making factual allegations related to the Antero George Lease, that the "Division Order" prepared by CHK Operating is unconscionable pursuant to West Virginia Code §§ 46–2A–108 and 46–2-302. Although Plaintiffs' response makes a half-hearted attempt to assert that the Court could also consider unconscionability claims against CHK and CHK Marketing, this Court relies on Plaintiffs' representation in their response to the motion to dismiss that Plaintiff does not allege unconscionability by CHK and CHK Marketing.

Therefore, the motion to dismiss filed by CHK and CHK Marketing is **GRANTED** as to the claims of unconscionability and fair dealing.

21

*IV. CONCLUSION*

For these reasons, Plaintiffs' motion to amend the Complaint [ECF 25] is **GRANTED,** CHK and CHK Marketing's motion to dismiss [ECF 8] is **GRANTED**, and, as a result, CHK Appalachia's motion to dismiss [ECF 7] is **GRANTED**.

This Court held a status conference with the parties on September 23, 2014 to discuss the Court's subject matter jurisdiction. For reasons stated more fully on the record at that hearing, the Court directs Plaintiffs to file an Amended Complaint that clarifies the allegations related to diversity jurisdiction no later than October 23, 2014.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER:        September 29, 2014

THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE

22